# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MUHAMMED GIBBS, *et al.*

       Plaintiffs,

    v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,

       Defendant.

Civil Action No. 12-1388 (CKK)

## MEMORANDUM OPINION
(July 9, 2014)

Plaintiffs Muhammed Gibbs, Elmer Crisco and Emiliano Crisostomo ("Plaintiffs") have filed suit against the Washington Metropolitan Area Transit Authority ("WMATA" or "Defendant") alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. Presently before the Court is Defendant's [22] Motion for Summary Judgment. Upon consideration of the pleadings,[1] the applicable authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART Defendant's motion. Specifically, the Court GRANTS Defendant's motion with respect to Plaintiffs' claims of discrimination premised on negative performance evaluations, as well as Plaintiffs' retaliation claims. However, the Court DENIES Defendant's motion with respect to Plaintiffs' discrimination claims premised on the termination of their employment.

---

[1] While the Court renders its decision on the record as a whole, its consideration has focused on the following documents: Def.'s Mot. for Summ. J., ECF No. [22] ("Def.'s MSJ"); Pls.' Resp. to Def.'s Mot. for Summ. J., ECF No. [23] ("Pls.' Opp'n"); Def.'s Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J., ECF No. [24] ("Def.'s Reply").

# I. BACKGROUND

## A. Factual Background

Plaintiffs are three former escalator and elevator mechanics for WMATA. In March 2011, they were employed as journeymen mechanics in WMATA's Elevator/Escalator ("ELES") Department. Def.'s Ex. 1 (Am. Compl.) ¶ 6; Def.'s Ex. 7 (Crisco EEOC Charge); Def.'s Ex. 5 (Crisostomo EEOC Charge). Plaintiffs Gibbs and Crisco are African-American, and Plaintiff Crisostomo is Asian-American. Def.'s Ex. 4 (Crisostomo EEOC Intake Questionnaire) at 1, 3.

Before proceeding to the main facts underlying this case, the Court first addresses the circumstances of Plaintiffs' employment during the time at issue, which provides relevant background to the sequence of events in this case. On or about December 2010, Andrew Mitchell became Plaintiffs' first-line supervisor. Pls.' Ex. 1 (Nici Dep.) at 16:1-5. Mitchell supervised a team of approximately eleven mechanics, seven of whom, including Plaintiffs, were minorities. Pls.' Opp'n at 14. Pls.' Ex. 4 (Guthrie Dep.) at 21:3-22:15. Plaintiffs contend that during his tenure as Plaintiffs' supervisor, Mitchell experienced significant tension with the minority mechanics working under him. As support for this position, Plaintiffs point to testimony from WMATA employees in the ELES Department. According to Ron Nunemaker, a Caucasian mechanic supervised by Mitchell, Mitchell exhibited "racist tendencies" including socializing with Caucasian mechanics, but pointedly ignoring minority mechanics in his team. Pls.' Ex. 3 (Nunemaker Dep.) at 24:6-13 ("I've seen, and witnessed many situations, where he was talking to Caucasians, and other members of his crew walked by, wouldn't say, none of them look at him, of ethnic-- Q: Minorities? A: -- be it Hispanic, be it – yeah. Or black. He wouldn't say anything to them."). In addition, Al Aiken, another supervisor in the ELES Department stated that minority mechanics under Mitchell's supervision complained to him that

Mitchell was "acting like a racist", although Aiken could not specifically recall the racist comments allegedly made by Mitchell. Pls.' Ex. 5 (Al Aiken Aff.) ¶¶ 12-14. Vincent Dew, one of the African-American mechanics who complained to Aiken, filed a discrimination complaint against Mitchell in June 2011 with WMATA's Office of Civil Rights alleging that Mitchell had discriminated against him by imposing improperly harsh sanctions for performance related issues and giving him a negative performance evaluation. Pls.' Ex. 13 (Dew EEO Complaint Outcome). In response to Dew's complaint, Dew was transferred out from under Mitchell's supervision. *Id.*

As further evidence of racial tension between Mitchell and the minority members of his team, Plaintiffs point to Mitchell's performance evaluations of his subordinates. Performance evaluations for mechanics re-commenced in the ELES department in early 2011 after a 10 year absence. Def.'s Ex. 14 at 48:10-20. The evaluations were to be filled out by supervisors on a quarterly basis. *Id.* at 44:15-19. Mitchell submitted two sets of performance evaluations for his subordinates, with the second set consisting of evaluations for the period ending April 1, 2011. Pls.' Ex. 14 (Performance Evaluations); Pls.' Ex. 23 (Performance Evaluations). Plaintiffs argue that Mitchell's performance evaluations show a clear pattern, such that Caucasian mechanics received positive evaluations while minority mechanics received negative reviews. For example, in his April 2011 evaluation for Paul Botto, a Caucasian mechanic, Mitchell wrote "Having Mr. Botto in sector 4 has been a joy." Pls.' Ex. 23 at 13. Mitchell described another white mechanic, Scott Doering, as "a good mechanic with a willingness and knowledge to teach other mechanics if the opportunity rises [sic]. I look forward to working with him in the future." *Id.* at 7. In a positive evaluation for another Caucasian mechanic, Nicholas Guthrie, Mitchell again wrote "Having Mr. Guthrie in sector 4 has been a joy." *Id.* at 2. By contrast, the evaluations for

Plaintiffs and other minority mechanics include the following negative language: "Mr. Gibbs' quality of work and productivity have suffered due to the fact that he lacks the skills needed to become proficient in his job."; "Mr. Crisostomo needs to improve multiple areas. His lack of knowledge is affecting his job productivity, the quality of work he produces, and his ability to perform independently. His overall job performance needs major improvement."; and "[Mr. Crisco's] lack of knowledge has hurt his quality of work and his ability to work independently." Pls.' Ex. 14 at 8 (Crisostomo Evaluation); *id.* at 11 (Crisco Evaluation); Pls.' Ex. 23 at 17 (Gibbs Evaluation). For the April 2011 period, Plaintiff Crisostomo received three "poor" ratings, four "below satisfactory" ratings and three "satisfactory" ratings. Pls.' Ex. 14 at 8. In the same period, Plaintiff Crisco received three "below satisfactory" ratings, five "satisfactory" ratings, and two "above satisfactory" ratings. *Id.* at 11. Plaintiff Gibbs April 2011 evaluation includes five "poor" ratings, two "below satisfactory" ratings, and three "satisfactory" ratings. Pls.' Ex. 23 at 17. During this April 2011 period, no Caucasian mechanics under Mitchell's supervision received any "poor" ratings. In addition, the only Caucasian mechanic to receive "below satisfactory" ratings was Scott Doering, whom, as noted, Mitchell's written evaluation described as "a good mechanic with a willingness and knowledge to teach other mechanics if the opportunity rises [sic]. I look forward to working with him in the future." Pls.' Ex. 23 at 6-7.

Defendant contests the apparent pattern in these evaluations, noting that minority mechanics, including Plaintiffs Crisco and Crisostomo, did not receive negative evaluations from Mitchell in January 2011, Pls.' Ex. 14 at 9 (Crisco Evaluation); Pls.' Ex. 23 at 21 (Crisostomo Evaluation), while Caucasian mechanics received merely satisfactory evaluations for this period. Pls.' Ex. 23 at 3. On this point, Defendant notes that in January 2011, Plaintiff Crisco received a performance evaluation where nine of ten categories were rated "above satisfactory" and one

category was rated "satisfactory." Pl.'s Ex. 14 at 9 (Crisco Evaluation). For this same time period, Plaintiff Crisostomo received seven "above satisfactory" ratings and three "satisfactory" ratings." Pl.'s Ex. 23 at 21. Further, Defendant points to testimony of WMATA supervisors stating that performance evaluations are not used for promotion or assignments. Def.'s Ex. 9 (Bitar Aff.) ¶ 15. According to Rodrigo Bitar, the General Superintendent of WMATA, "[t]heir purpose is to allow new supervisors to have some information regarding the ELES mechanics, who often move to different job assignments through the union 'pick' process, which is dependent upon their seniority status." *Id.* Similarly, Mitchell Nici, Plaintiffs' second-line supervisor, testified that although performance is considered when a mechanic applies for a promotion, under an agreement with Plaintiffs' union, performance evaluations prepared by supervisors are not considered. Pls.' Ex. 1 at 45:2-46:13. *See also* Missing Deposition Pages Filed in Response to June 26, 2014 Minute Order, ECF No. [26]; Additional Deposition Pages Filed in Response to June 26, 2014 Minute Order, ECF No. [28]. Nevertheless, apparently due to complaints from members of his team, Mitchell's performance evaluations were removed from all of his subordinates' personnel files after consultation with WMATA's Office of Civil Rights in April 2011. Def.'s Ex. 9 ¶ 15. The Office of Civil Rights determined that Mitchell had not been given any training in how to write performance evaluations and determined that the best option was to remove the evaluations from his team members' files. *Id.*

With this background, the Court proceeds to the events underlying the vast majority of this suit. On the evening of March 9, 2011, all three Plaintiffs, working as a team, reported to WMATA's Courthouse Metrorail Station in Arlington, Virginia to perform preventive maintenance on three exterior escalators at the station. Def.'s Ex. 1 ¶ 40; Def.'s Ex. 5. The internal WMATA designations of these three escalators are K01X01, K01X02, and K01X03.

Def.'s Ex. 14 at 67:18-21. One component of WMATA's preventive maintenance procedures involves testing the comb impact device, an apparatus located at the top and bottom of each escalator. *Id.* at 113:1-4. The comb impact device is a safety mechanism which shuts down an escalator if an individual or an object gets caught in the comb plates located at the top and bottom of each escalator. *Id.* at 5-11. If the comb impact device is improperly calibrated, meaning it is not set within code limits, there is a potential for serious injury or loss of life. Def.'s Stmt. of Facts ¶ 6; Pls.' Stmt. of Facts at 1.

As part of their work on the evening of March 9, 2011, Plaintiffs were initially assigned the responsibility for comb impact testing on the three exterior escalators. Def.'s Ex. 10 (Crisco Letter of 3/28/11); Def.'s Ex. 8 (Mitchell Investigation). Early on in Plaintiffs' work, at approximately 9:00 P.M., Plaintiff Crisco received a call from Mitchell. Pls.' Ex. 15 (Cell Phone Records) at 2. The parties dispute the content of this call. Plaintiffs claim that Mitchell told Crisco to cease performing comb impact testing going forward, as Mitchell had assigned a specific team to perform comb impact testing. Pls.' Ex. 10 (Crisco EEO Filing of April 8, 2011) at 1. Plaintiff Crisco states that he relayed this message to Plaintiffs Gibbs and Crisostomo. *Id.* Defendant disputes that Mitchell told Plaintiffs not to perform comb impact testing. Pls.' Ex. 1 at 87:8-13. However, there is evidence that at least at one other point in 2011, Mitchell did assign a team the specific responsibility for comb impact testing. Pls.' Ex. 17 (Parker Statement).

In any case, Plaintiffs state that, based on Mitchell's instructions, they did not perform comb impact testing on the three exterior escalators at the Courthouse Metrorail Station. Pls.' Ex. 10 at 1. Nevertheless, on the preventive maintenance sheets ("PM sheets") tracking their work, they did enter values for comb impact testing for these three escalators and state that they

completed this task. Def.'s Ex. 12 (PM Sheets) at 1-6. Plaintiffs explain these entries as a clerical error on the part of Plaintiff Crisco. Def.'s Ex. 7 (Crisco Charge of Discrimination) at 2. Plaintiff Crisco states that he and the other Plaintiffs were inspecting several stations as part of their maintenance work. *Id.* When filling out the PM sheets for these various inspections, Crisco believes that he placed the forms out of order and mistakenly entered comb impact testing numbers for another station's escalators (apparently conducted prior to Mitchell's alleged directive) on the PM sheets for the Courthouse Metrorail Station, despite the fact that no testing occurred at this station. *Id.*

The following week, on March 17, 2011, mechanic Nicholas Guthrie, also a part of Mitchell's team, was working at the Courthouse Metrorail Station with mechanic Anthony Parker. Def.'s Ex. 13 (Guthrie Dep.) at 50:3-17, 52; Def.'s Ex. 8 at 1. According to Defendant, Guthrie and Parker were cleaning the escalator pits and inspecting the escalator's safety circuits. Def.'s Ex. 13 at 52:16-22. While cleaning the escalator pits, Guthrie observed that the horizontal comb impact springs of one of the exterior escalators were compressed. *Id.* at 55:4-7; Def.'s Ex. 8 at 1. This tight compression suggested that the comb impact device was not adjusted correctly, such that the escalator might fail to shut down appropriately during an emergency. Def.'s Ex. 13 at 58:4-9. Upon recognizing a potential safety issue, Guthrie called Mitchell, his supervisor, and reported his observations. *Id.* at 60:3-8. Guthrie recalls that Mitchell came to see the tightly compressed springs the same night. *Id.* at 60:14-61:8.

Subsequently, at a time prior to March 21, 2011, Mitchell contacted Nici, who, as noted, was Mitchell's supervisor and Plaintiffs' second-line supervisor. Pls.' Ex. 1 at 67:1-13. According to Nici, Mitchell stated that he was concerned about possible falsification of data at the Courthouse Metrorail Station. *Id.* On March 21, 2011, Mitchell went to the Courthouse

station to test what Guthrie had reported regarding escalator K01X01. Def.'s Ex. 8 at 1. Guthrie and Parker tested the springs with Mitchell observing. Def.'s Ex. 13 at 61:22-62:3. On March 22 and 23, 2011, Mitchell took Guthrie and Parker to test the comb impact devices for the other two escalators at the Courthouse Metrorail Station. Def.'s Ex. 8 at 2-3.

Mitchell compiled his findings in a document entitled "Supervisor Investigation of K01X01, K01X02 and K01X03" and sent the report to Nici. Def.'s Ex. 8; Def.'s Ex. 14 (Nici Dep.) at 66:12-22. Mitchell reported to Nici that measurements for all three escalators indicated comb impact devices that were compressed too tightly and exceeded code allowance. Def.'s Ex. 8; Def.'s Ex. 14 at 72:15-22. Plaintiffs were first interviewed regarding these findings on March 28, 2011, at which time they were officially notified that they were under investigation for falsification of records. Def.'s Ex. 9 ¶ 11. On March 28, 2011, Mitchell submitted three documents – one for each Plaintiff – entitled "Results of Investigation by Foreman." Def.'s Ex. 11 (Results of Investigation by Foreman). These documents stated that each Plaintiff had been interviewed regarding "Falsified Documents." *Id.* These forms further indicated that the comb pull device measurements for the three exterior escalators at the Courthouse Metrorail Station did not match the measurements recorded on the PM sheets signed by Plaintiffs. *Id.* These forms also provided a brief statement from each of the Plaintiffs. *Id.* Repeating the version of events discussed above, Plaintiffs stated that they were instructed not to perform comb impact testing by Mitchell. *Id.* Plaintiff Crisco explained the numbers recorded on the PM sheets as a clerical error on his part. *Id.*

Mitchell, as a first-line supervisor, did not have the authority to suspend or terminate employees. Def.'s Ex. 14 at 64:3-21. Rather, according to Nici, the greatest authority he has with respect to discipline is "[h]is authority . . . to report." *Id.* at 64:6. Nevertheless, Plaintiffs

argue that Mitchell had some discretion in *how* and *what* to report, and, in this respect, his decision to accuse Plaintiffs of falsifying safety data constituted an unnecessarily harsh sanction. As support for this position, Plaintiffs point to testimony from Nunemaker, Plaintiffs' Caucasian co-worker, stating that Mitchell, like other ELES supervisors, had previously allowed white mechanics to correct errors in their paperwork without taking the matter further. *See* Pls.' Ex. 3 at 34:6-20 (Nunemaker stating, in response to the question "Do you ever remember Mr. Mitchell coming up to Mr. Botto and saying, hey, you know, you made a mistake on the paperwork", "That's happened with every – pretty much every supervisor; yeah.").

Upon Mitchell's accusation of falsification of safety data, the matter proceeded to an investigative panel consisting of WMATA supervisors. Def.'s Ex. 15 (Synopsis of Falsification Investigation) at 1. On April 7, 2011, Plaintiffs were interviewed individually by this five-member investigative panel, which included Nici. *Id*. The only other person interviewed as part of this investigation was Mitchell. Pls.' Ex. 1 at 88:13-18. The investigative panel questioned Plaintiffs about the comb impact data entered on the March 9, 2011 PM sheet. Def.'s Ex 15. Plaintiffs stated that they were told by Mitchell not to conduct any more comb impact testing for that night or in the future. *Id.* However, in evaluating this explanation, the panel noted an apparent contradiction in Plaintiffs' story. *Id.* Def.'s Ex. 14 at 115:9-22; Def.'s Ex. 22 (Nici Dep.) at 80:22-82:7. Plaintiffs' PM sheets for work performed after March 9, 2011 showed that Plaintiffs continued to perform comb impact testing on other escalators five times in March 2011. *Id.* Specifically, PM sheets signed by Plaintiffs for March 16, 17, 22, 27, and 28, 2011 at various other Metrorail stations show inspection entries for comb impact testing. Def.'s Ex. 12 at 7-20. According to the panel, Plaintiffs were unable to explain how the entries on these later forms were consistent with their story that Mitchell had told them to cease performing comb

impact testing.  Def.'s Ex. 15 at 2.  Def.'s Ex. 22 at 81:6-82:7.  Based on this apparent contradiction in Plaintiffs' explanation of the events, the panel concluded that Plaintiffs had falsified the March 9, 2011 PM sheets for the Courthouse Metrorail Station.

On April 8, 2011, Plaintiff Crisco filed an internal complaint with WMATA's Equal Employment Opportunity Office.  Pls.' Ex. 10 at 1.  This complaint reiterated Plaintiffs' defense against the charges of falsification of data – again explaining the entries on the PM sheets as clerical error – and accused Mitchell of "being deceitful and lying for no good reason."  *Id.* at 2. However, Plaintiff Crisco's filing did not allege any sort of discrimination on the basis of race. *Id.*

On April 10, 2011, Nici sent Cedric Watson, the then-Superintendent of ELES, a memo entitled "Synopsis of Falsification Investigation."  Def.'s Ex. 15.  This memo summarized the investigative findings for the three Plaintiffs.  Def.'s Ex. 9 ¶ 13.  Watson then consulted with Bitar, the General Superintendent of WMATA, regarding the appropriate discipline based on the panel's investigation.  *Id.*

On April 12, 2011, Plaintiff Crisco filed another complaint regarding Mitchell with WMATA's Office of Civil Rights.  Def.'s Ex. 18 (Crisco Office of Civil Rights Complaint of April 12, 2011).  The Complaint charged, *inter alia*, that Mitchell treated his subordinates "with a bias[ed] attitude" and that "the senseless attacks on employees under the supervision of Andrew Mitchell are deliberate and are racially motivated."  *Id.*  In addition, on April 15, 2014, Plaintiff Crisco filed a complaint with his union regarding "unfair and bias[ed] job performance evaluations" as well as Mitchell's "attempt to discredit all minority mechanics."  Pls.' Ex. 11 (Crisco Union Complaint of April 15, 2011).  Subsequently, on April 20, 2011, all three Plaintiffs, along with other mechanics in the ELES Division, signed a discrimination complaint,

apparently with WMATA's Equal Employment Opportunity Office, complaining of racially discriminatory treatment by Mitchell. Pls.' Ex. 6 (Joint Complaint of April 20, 2011) The complaint specifically mentioned "Mitchell's continuous harassment of minority employees" and charged that his "job performance evaluations of unsatisfactory and poor ratings to veteran minority mechanics" were "an unjustified and racially motivated attack on [their] character and job performance with intent to discredit minority employees." *Id.* In addition, also on April 20, 2011, Crisco filed another complaint with his union alleging that Mitchell was treating minority mechanics in a racially discriminatory manner. Pls.' Ex. 7 (Crisco Union Complaint of April 20, 2011). Crisco requested that the union "look into this situation very soon, as it is destroying morale, quality of work, and making for an unsafe working environment." *Id.*

On April 21, 2011, WMATA informed Plaintiffs of the termination of their employment. Def.'s Ex. 16 (Termination Memoranda). Bitar, as the General Superintendent of WMATA, made the decision to terminate Plaintiffs. Def.'s Ex. 9 ¶ 14. Bitar states that he made this decision 24-48 hours prior to the issuance of the termination letter to Plaintiffs on April 21, 2011. *Id.* Bitar further states that at the time he made this decision, he was unaware of any claim by Plaintiffs of alleged race discrimination by Andrew Mitchell or other WMATA employees. *Id.*

### B. Procedural Background

Plaintiffs filed suit in this Court on August 22, 2012, alleging discrimination and retaliation in violation of Title VII. After the parties engaged in discovery, Defendant filed the present [22] Motion for Summary Judgment on November 8, 2013. Plaintiffs subsequently filed an Opposition and Defendant filed a Reply. Accordingly, the motion is now ripe for review.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of her position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty*

*Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

### III.  DISCUSSION

Plaintiffs raise two sets of claims under Title VII.  First, they argue that their negative performance evaluations and terminations constitute discrimination on the basis of race.  Second, they argue that their terminations constitute retaliation for protected activity.  Defendant argues that all of these claims should be dismissed on the merits, and further argues that Plaintiff Gibbs' claims should be dismissed for failure to exhaust.  After first addressing Defendant's exhaustion argument, the Court turns to Plaintiffs' discrimination and retaliation claims.

### A.  Administrative Exhaustion

Before proceeding to the merits of Plaintiffs' claims, the Court addresses a threshold question raised by Defendant as to Plaintiff Gibbs' claims.  Defendant argues that because Plaintiff Gibbs filed his Charge of Discrimination with the EEOC more than 180 days after his termination, he has failed to appropriately administratively exhaust his Title VII claims premised on this termination.  Def.'s MSJ at 8-9.  In order to maintain an action for discrimination based

on race or retaliation in violation of Title VII, a prospective plaintiff must file a Charge of Discrimination with the EEOC within 180 days from the date of the alleged violation. 42 U.S.C. § 2000e-5(e)(1). *See also Washington v. Wash. Met. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998) ("Before suing under . . . Title VII, an aggrieved party must exhaust his administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged discriminatory incident."). Here, Plaintiff Gibbs was terminated on April 21, 2011, but his Charge of Discrimination was not filed until April 6, 2012. Def.'s Ex. 3 (Gibbs Charge of Discrimination). Because Plaintiff Gibbs' filed his Charge of Discrimination complaining of discrimination in his termination more than 180 days after the last alleged discriminatory action, Defendant argues that his claims should be dismissed. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("A claim is time barred if it is not filed within these time limits").

Yet as Plaintiffs point out, there is an exception to this principle. Pls.' Opp'n at 31-33. The D.C. Circuit has recognized a single-filing rule, which "allows non-filing parties to join the lawsuit of a filing party if they possess claims 'that are so similar to those asserted by the original plaintiff[ ] that no purpose would be served by requiring [them] to file independent charges.'" *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 807 (D.C. Cir. 2010) (quoting *Foster v. Gueory*, 655 F.2d 1319, 1323 (D.C. Cir. 1981)). *See also Emory v. United Airlines, Inc.*, 821 F.Supp.2d 200, 229 (D.D.C. 2011) ("where two plaintiffs allege that they were similarly situated and were subjected to the same discriminatory treatment, the purposes of the exhaustion requirement are adequately served if one plaintiff has filed an EEOC charge."). "[I]f the original filing performs the 'principal functions of the EEOC filing requirement' of providing the defendant with notice of all charges and offering the EEOC an opportunity to resolve the matter,

a second filing is not necessary if a similarly situated plaintiff wishes to join the suit." *Brooks*, 606 F.3d at 807 (quoting *Foster*, 655 F.2d at 1323).

Here, Plaintiffs appropriately invoke the single-filing rule with respect to Plaintiff Gibbs' claims premised on his termination. Defendant does not argue that Plaintiffs Crisco and Crisostomo failed to timely file their Charges of Discrimination and appropriately exhaust their claims. *See* Def.'s Ex. 5 (Crisostomo Charge of Discrimination); Def.'s Ex. 7 (Crisco Charge of Discrimination). Accordingly, the question becomes whether all three Plaintiffs are similarly situated. "The similarity of two claims is evaluated for whether the original filing performs the principal notice function of the EEOC filing requirement, thus rendering a second filing by a similarly situated plaintiff unnecessary and wasteful." *Byrd v. Dist. of Columbia*, 807 F.Supp.2d 37, 63 (D.D.C. 2011). "An original claim must: (1) put the employer-defendant on notice of all charges by the similarly situated plaintiff, and (2) provide the employer and the EEOC with an opportunity for administrative consolidation and resolution." *Id.* "[W]here complaints differ such that there is a real possibility that one claim may be settled administratively while the other may be resolved only in the courts, plaintiffs must file separate EEOC charges." *Id.* Here, Plaintiffs easily meet the standard for the single-filing rule. All three Plaintiffs raise materially identical claims, concerning the same adverse action and involving the same factual background. Indeed, Defendant has raised no argument that these Plaintiffs are not similarly situated such that separate filings would be necessary to serve the purposes of EEOC filing. Rather, in a situation such as this, where Plaintiffs' "claims are so similar that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges, then it would be 'wasteful, if not vain,' . . . to require separate EEOC filings." *Foster*, 655 F.2d at 1322 (citation omitted).

Accordingly, the Court rejects Defendant's argument that Plaintiff Gibbs' claims should be dismissed because he failed to timely file an EEOC Charge of Discrimination.

## B. Discrimination

Title VII of the Civil Rights Act makes it unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Here, Plaintiffs allege discriminatory treatment in two instances: (1) their negative performance evaluations, and (2) their termination. Pls.' Opp'n 19-21.

### 1. Performance Evaluations

In order to bring a Title VII claim, a plaintiff must have suffered an adverse action. *See Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013) (noting that an adverse action is a prerequisite for a Title VII claim) (citing *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)); *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007) ("Liability for discrimination under Title VII requires an adverse employment action.") (citing *Brown v. Brody*, 199 F.3d 446, 452-55 (D.C. Cir. 1999)). For purposes of Title VII discrimination claims, "[a]n 'adverse employment action' is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)). "An employee must 'experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir.

2002)).  The D.C. Circuit has cautioned that "not everything that makes an employee unhappy is an actionable adverse action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  Indeed, in this respect, "courts are not 'super-personnel department[s] that reexamine[] an entity's business decision[s].'"  *Stewart*, 352 F.3d at 429 (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

Here, Defendant argues that the negative performance evaluations received by Plaintiffs do not constitute adverse employment actions.  Def.'s MSJ at 20-21.  Def.'s Reply at 3-4.  The D.C. Circuit has "rejected the argument that poor performance evaluations are necessarily adverse actions", *Russell*, 257 F.3d at 817 (citation omitted), concluding instead that "the effect of a poor evaluation is ordinarily too speculative to be actionable."  *Douglas*, 559 F.3d at 553 (citing *Russell*, 257 F.3d at 818).  *See also Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999) ("[A] thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions.").  Accordingly, "for employment actions that do not obviously result in a significant change in employment status – such as giving a poor performance evaluation . . . an employee must go the further step of demonstrating how the decision nonetheless caused an objectively tangible harm."  *Douglas*, 559 F.3d at 553.  In undertaking this inquiry, the Court must "consider whether the alleged harm is unduly speculative."  *Id.*  For example, although "the effect of a poor evaluation is ordinarily too speculative to be actionable", if "that evaluation determines [a benefit such as a] bonus . . . then the employee may show the evaluation caused an objectively tangible harm."  *Id.*  On the other hand "a poor performance evaluation – which obviously *might* cause harm – is not itself actionable because of inherent speculativeness."  *Id.* at 555 n. 3 (emphasis in original).

Here, Plaintiffs contend that the performance evaluations are themselves an adverse employment action because they *could* be used in making promotion decisions. Pls.' Opp'n at 19-20. Yet the record evidence actually supports the opposite conclusion. As support for their argument, Plaintiffs point to Nici's deposition testimony stating that performance is considered when a mechanic applies for a promotion. *Id.* (citing Pls.' Ex. 1 at 45:12-15). However, Nici's comment comes as part of a larger discussion in which he specifically denies that the performance evaluations prepared by supervisors are used in making promotion decisions. Pls.' Ex. 1 at 45:12-46:20. *See also* Missing Deposition Pages Filed in Response to June 26, 2014 Minute Order, ECF No. [26]; Additional Deposition Pages Filed in Response to June 26, 2014 Minute Order, ECF No. [28]. This characterization of performance evaluations and their irrelevance in making promotion decisions is further supported by statements in Bitar's affidavit. *See* Def.'s Ex. 9 ¶ 15 ("The performance evaluations that Plaintiffs discuss in their Complaint are not used for promotion or assignments. Their purpose is to allow new supervisors to have some information regarding the ELES mechanics, who often move to different job assignments through the union 'pick' process, which is dependent upon their seniority status."). The only other evidence offered by Plaintiffs to counter this testimony and support the proposition that performance evaluations are used in making promotion decisions is the deposition testimony of Ron Nunemaker, another mechanic supervised by Mitchell and a former co-worker of Plaintiffs. Pls.' Opp'n at 20-21 (citing Pls.' Ex. 3). Yet this testimony hardly provides support for Plaintiffs' argument. In response to a question regarding whether performance evaluations are "used as any factor in any decisions regarding promotions, or discipline, or anything like that", Nunemaker responds "I believe they are, because everything that goes in your record is looked at, I guess, for that situation." Missing Deposition Pages Filed in Response to June 26, 2014

Minute Order, ECF No. [26] at 1; Additional Deposition Pages Filed in Response to June 26, 2014 Minute Order, ECF No. [28] at 1. However, Nunemaker qualifies this statement, admitting that he has never applied for a promotion and that no one has "ever brought up to [him] . . . with respect to any promotions, or disciplinary actions, [his] past history with performance evaluations." *Id.* The testimony of a single mechanic, who admits that he has never applied for a promotion and has no experience first- or second-hand with performance evaluations being used in personnel decisions, is insufficient to rebut the detailed testimony of two WMATA supervisors that these performance evaluations are not used in making promotion decisions.

Moreover, *even if* the performance evaluations were used in making promotion decisions as Plaintiffs claim, this does not establish that Plaintiffs' poor performance evaluations constitute an adverse action. As the D.C. Circuit has noted, "[t]he result of an evaluation is often speculative, making it difficult to remedy. For example, a single poor evaluation may drastically limit an employee's chances for advancement, or it may be outweighed by later evaluations and be of no real consequence." *Russell*, 257 F.3d at 818. Accordingly, "an employee must go the further step of demonstrating *how the decision nonetheless caused . . . an objectively tangible harm*." *Douglas*, 559 F.3d at 553 (emphasis added). For example, in *Russell*, "the size of [the plaintiff's] bonus was directly tied to her performance rating; a higher rating would have automatically meant a larger bonus." 257 F.3d at 819. Here, Plaintiffs do not establish a similar causal link between their evaluations and an objectively tangible harm. Plaintiffs do not contend that their evaluations played a role in their termination, nor do they allege any change in employment status or salary that was caused by (or was blocked by) these evaluations. *See Davis v. Joseph J. Magnolia, Inc.*, 815 F.Supp.2d 270, 282 (D.D.C. 2011) (A 'lower score on the employee's performance evaluation, by itself, is not actionable,' for instance, 'unless [the

employee] can establish that the lower score *led to a more tangible form of adverse action*, such as ineligibility for promotional opportunities.'") (quoting *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006)) (emphasis in original). Similarly, Plaintiffs have not identified any positions for which they were passed over, or even positions for which they considered applying. In fact, Plaintiff Crisco testified that he no longer had any possibility of promotion above his current position. Def.'s Ex. 21 (Crisco Dep.) at 135:12-20. Moreover, after consultation with WMATA's Office of Civil Rights, these evaluations were removed from Plaintiffs' and their co-workers' files in April 2011.[2] Def.'s Ex. 9 ¶ 15. In the end, Plaintiffs offer nothing more than bare speculation as to the effects of these poor performance evaluations, which is insufficient to render them adverse. *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) ("Taylor's bare, conclusory allegation that she was denied promotional and bonus opportunities [as a result of her poor performance evaluations] does not discharge her burden to show the evaluations were attached to financial harms.") (internal citation omitted); *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("evaluations and written warnings were not adverse actions because none had tangible job consequences.") (internal citation omitted); *Kelly v. LaHood*, 840 F.Supp.2d 293 (D.D.C. 2012) ("Having provided no evidence suggesting that any tangible, objective harm accompanied the PY 2007 evaluation, Kelly has not discharged his burden to show the evaluations were attached to financial harms.") (internal citations and alterations omitted). Accordingly, Plaintiffs' discrimination claims premised on their performance evaluations are dismissed.

---

[2] The record is unclear as to whether these evaluations were removed before or after Plaintiffs' termination on April 21, 2014. However, as noted, Plaintiffs do not argue that these evaluations played any role in their termination.

## 2. Termination

In contrast to Plaintiffs' performance evaluations, there is no question that Plaintiffs' termination constitutes an adverse action. It is well-established law in this Circuit that firing is "conclusively presumed to be [an] adverse employment action[], even if any alleged harm is speculative." *Douglas*, 559 F.3d at 552-53. Accordingly, the Court analyzes Plaintiffs' argument that their termination was discriminatory under the standard framework applicable to Title VII claims. Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination or retaliation. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). For a claim alleging disparate-treatment discrimination, a plaintiff makes out a prima facie case by showing (1) that he is a member of a protected group; (2) that he suffered an adverse action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Once a plaintiff makes out a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [adverse action].'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). If the defendant is successful, then "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted).

In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the D.C. Circuit simplified the analysis for disparate treatment suits. Under *Brady*, once an employer has proffered a non-discriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough

evidence to defeat the defendant's proffer of a legitimate, non-discriminatory reason and support a finding of discrimination. *See Brady,* 520 F.3d at 494 ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*") (emphasis in original). Consequently, at the summary judgment stage, a district court is left with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F.Supp.2d 114, 118 (D.D.C. 2010).

Here, Defendant has offered a legitimate, non-discriminatory reason for Plaintiffs' termination, stating that Plaintiffs were terminated for falsifying maintenance sheets for escalators at the Courthouse Metrorail Station. Def.'s MSJ at 1, 11-12. After another mechanic, Nicholas Guthrie, noticed that the comb impact springs on one of the escalators were tightly compressed, he notified his and Plaintiffs' supervisor, Mitchell. After Mitchell tested the springs with the help of Guthrie and Anthony Parker, Nici and other WMATA supervisors conducted an investigation. Bitar, relying on the conclusions of this investigation, made the decision to terminate Plaintiffs for falsifying safety data.

Plaintiffs argue that WMATA's legitimate, non-discriminatory reason is pretext because they did not falsify the maintenance sheets. Pls.' Opp'n at 20-28. Plaintiffs do not argue that

Nici or Bitar – the ultimate deciding official – were motivated by discriminatory animus. Rather, Plaintiffs assert that Mitchell, although not the relevant decisionmaker, was responsible for their termination because he initiated and conducted the initial investigation into the relevant escalators and leveled the accusation of falsified data. In addition, Plaintiffs argue that the deciding officials credited Mitchell's disputed claim that he never told Plaintiffs to cease comb impact testing. Plaintiffs thus allege a "cat's paw" relationship, under which Mitchell's discriminatory action was the proximate cause of their termination.[3] *Id.* at 25-28.

In *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1194 (2011), the Supreme Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ."[4] The exercise of independent judgment by the ultimate decisionmaker "does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus from being the proximate cause of the harm. Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Id.*

Viewing the facts in the light most favorable to the Plaintiffs, Mitchell's actions with respect to their termination can be summarized as follows: Upon learning of the situation at the

---

[3] The term "cat's paw" has its origin in Aesop's Fables. In the relevant fable, "a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the money makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1190 n. 1 (2011).

[4] Although the decision in *Staub* concerned employment discrimination in violation of the Uniformed Services Employment and Reemployment Act (USERRA), 38 U.S.C. § 4311, the Court recognized that this "statute is very similar to Title VII." *Staub*, 131 S.Ct. at 1191. Accordingly, lower courts have routinely applied the principles of *Staub* in the Title VII context. *See, e.g., Hampton v. Vilsack*, 685 F.3d 1096, 1101-02 (D.C. Cir. 2012); *Adamczyk v. New York Dept. of Corr. Servs.*, 474 Fed. Appx. 23, 26 (2d Cir. 2012)

Courthouse Metrorail Station, Mitchell leveled the accusation of data falsification against Plaintiffs, leading to their investigation by a panel led by Nici. Mitchell supported this accusation by telling the investigative panel that he never ordered Plaintiffs to cease comb impact testing, thus offering a counter-narrative to Plaintiffs' version of the facts.

Defendant first argues that there is insufficient evidence upon which a jury could conclude that Mitchell's actions in initiating and substantiating the investigation were discriminatory. Def.'s Reply at 12-14. Viewing the facts in the light most favorable to the Plaintiffs, as the Court must on a motion for summary judgment, the Court disagrees. A jury could read several items in the record to show Mitchell was motivated by discriminatory animus in initiating and substantiating the investigation of Plaintiff. First, as noted, during the brief period in which he functioned as Plaintiffs' supervisor, there was significant tension between Mitchell and the minority mechanics under his supervision. Ron Nunemaker, a Caucasian mechanic under Mitchell's supervision and a co-worker of Plaintiffs, testified that Mitchell was friendly with the white employees under his supervision, but pointedly ignored the non-white mechanics in his division. *See* Pl.'s Ex. 3 at 24:6-13 ("I've seen, and witnessed many situations, where he was talking to Caucasians, and other members of his crew walked by . . . He wouldn't say anything to them."). Nunemaker testified that such actions spoke to what he and other mechanics perceived as Mitchell's "racist tendencies." *Id.* at 24:6. Similarly, other minority members of Mitchell's division, such as Vincent Dew, filed racial discrimination complaints against Mitchell during approximately the same period. Pls.' Ex. 13. Such "[e]vidence of an employer's past discriminatory or retaliatory behavior toward other employees – so-called 'me too' testimony – may, depending on the circumstances, be relevant to whether an employer

discriminated or retaliated against a plaintiff."  *Nuskey v. Hochberg*, 723 F.Supp.2d 229, 233 (D.D.C. 2010)).

A jury could also find evidence of Mitchell's discriminatory animus in his performance evaluations of the mechanics in his division.  Although these evaluations are not adverse employment actions themselves, for reasons discussed, *supra* Section III.B.1, viewing these evaluations as a whole, a jury could find that Mitchell generally gave more favorable reviews to Caucasian mechanics than to minority mechanics.  Such a difference could reveal a preference for non-minority mechanics as compared to minority mechanics.  For example, as noted, in his April 2011 evaluations for Paul Botto, a Caucasian mechanic, Mitchell wrote "Having Mr. Botto in sector 4 has been a joy."  Pls.' Ex. 23 at 13. Mitchell described another white mechanic, Scott Doering, as "a good mechanic with a willingness and knowledge to teach other mechanics if the opportunity rises [sic].  I look forward to working with him in the future."  *Id.* at 7.  In a positive evaluation for another Caucasian mechanic, Nicholas Guthrie, Mitchell again wrote "Having Mr. Guthrie in sector 4 has been a joy."  *Id.* at 2.  By contrast, the evaluations for Plaintiffs and other minority mechanics include the following negative language: "Mr. Gibbs' quality of work and productivity have suffered due to the fact that he lacks the skills needed to become proficient in his job."; "Mr. Crisostomo needs to improve multiple areas.  His lack of knowledge is affecting his job productivity, the quality of work he produces, and his ability to perform independently.  His overall job performance needs major improvement."; and "[Mr. Crisco's] lack of knowledge has hurt his quality of work and his ability to work independently."  Pls.' Ex. 14 at 8 (Crisostomo Evaluation); *id.* at 11 (Crisco Evaluation); Pls.' Ex. 23 at 17 (Gibbs Evaluation).  Although Defendant correctly points out that these evaluations do not perfectly correlate with an employee's race, and that Plaintiffs did not all receive negative evaluations in January 2011, the

Court concludes that there is enough of a pattern in the evaluations, particularly those from April 2011, from which a reasonable juror could find that Mitchell may have preferred non-minority mechanics.[5]

A jury could also infer discriminatory animus from Mitchell's decision to characterize Plaintiffs' offense as falsification of data, rather than a mere paperwork error. Plaintiffs have put forth evidence that Mitchell, like other supervisors, previously provided white mechanics the opportunity to correct their paperwork errors. *See* Pls.' Ex. 3 at 34:6-20. Yet here, Mitchell, apparently without first speaking to Plaintiffs, contacted Nici and characterized the discrepancy in Plaintiffs' paperwork as the much more serious infraction of falsification of data. Pls.' Ex. 1 at 67:1-13. Upon leveling this accusation, Mitchell triggered a formal investigation into Plaintiffs' actions that resulted in their termination. *See* Def.'s Ex. 15. A jury could conclude that Mitchell's decision to immediately proceed to an accusation and investigation of this more serious offense – when non-minority mechanics were given the opportunity to correct errors in their paperwork – reflected discriminatory animus.

Because the Court finds evidence from which a jury could conclude that Mitchell's decision to initiate and substantiate the investigation of Plaintiffs for falsification of data was motivated by discriminatory animus, the Court moves to Defendant's remaining argument. Defendant argues that even if Mitchell was motivated by discriminatory animus, the causal chain between his actions and the ultimate decision to terminate Plaintiffs was severed by the actions of the investigative panel. Def.'s Opp'n at 8-12. Specifically, Defendant points to the fact that

---

[5] Defendant does not dispute that Mitchell's actions were "intended . . . to cause an adverse employment action." *Staub*, 131 S.Ct. at 1194. Nor does the Court find reason to believe that this prong of *Staub*'s test has not been met here. Whether or not Mitchell initiated the investigation with discriminatory animus, there does not appear to be any dispute that he initiated the investigation with the intent of causing an adverse employment action.

the investigative panel considered and rejected Plaintiffs' proffered explanation – that Mitchell had told them to cease performing comb impact testing and that the values entered on the PM forms were a clerical error. *Id.* at 9-10. The panel, as part of its investigation, found inconsistencies in this story, specifically that Plaintiffs continued to complete PM sheets after March 9, 2011. The panel concluded that if Plaintiffs were instructed to cease comb impact testing by Mitchell, as they claimed, it made little sense that they continued to enter comb impact data on PM sheets after March 9, 2011.[6] Accordingly, Defendant argues, even in the absence of Mitchell's alleged discriminatory conduct, the panel would have reached the same conclusion, severing the causal chain between Mitchell's actions and Plaintiffs' termination. On this point, Defendant cites Nici's deposition testimony that the investigative panel did not rely on Mitchell's statement in reaching its conclusion, but instead reached its conclusion based on the inconsistencies in Plaintiffs' story. *Id.* at 9 (quoting Def.'s Ex. 22 at 81:6-82:7).

The Court disagrees that the causal link between Mitchell's actions and Plaintiffs' termination was clearly broken by the investigative panel's actions. "[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Staub*, 131 S.Ct. at 1192. As the Supreme Court has made clear, "[p]roximate cause

---

[6] In their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs assert for the first time the additional claim that Mitchell withdrew the ostensible order to cease performing comb impact testing after March 9, 2011. Pls.' Opp'n at 4. Accordingly, Plaintiffs appear to argue that the comb impact testing they performed after March 9, 2011 was not a contradiction of their story, but rather was consistent with Mitchell's later order. Plaintiffs, however, provide no citation to the record for this statement, and the Court's review of the record discloses none. Indeed, such an allegation contradicts the clear and consistent statements Plaintiffs previously made in discovery and to the investigative panel, some in writing, that Mitchell told them to cease performing all comb impact testing. Based on the record before the Court, none of the Plaintiffs ever previously alleged that Mitchell re-assigned them to comb impact testing after March 9, 2011. Therefore, the Court will not consider Plaintiffs' unsupported contention.

requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Id.* (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Here, viewing the facts in the light most favorable to Plaintiffs, the Court finds that even after probing Plaintiffs' explanation for inconsistencies, the panel still ultimately relied on Mitchell's initial accusation that Plaintiffs had falsified the relevant forms. To be sure, Nici has stated that in reaching its conclusion, the panel did not rely on Mitchell's statements, and instead reached its decision based on the inconsistencies in Plaintiffs' story. Def.'s Ex. 22 at 80:19-82:7. Yet Nici's statement arguably oversimplifies the causal chain. If a jury were to take the view of Mitchell's actions discussed above, in which he initiated and substantiated the investigation of Plaintiffs, then rejecting Plaintiffs' version of the events and accepting Mitchell's accusation are two sides of the same coin. The decision to distrust Plaintiffs' explanation *led* the panel to a corresponding decision to trust Mitchell's alternative version of the events, *i.e.* that he never told Plaintiffs to cease comb impact testing and Plaintiffs falsified the PM sheets at issue. Accordingly, while Plaintiffs' inability to explain the inconsistency noted by the panel certainly contributed to Plaintiffs' termination by persuading the panel to reject their explanation, it does not automatically *remove* Mitchell's accusations of falsification as a proximate cause of this employment decision. "[T]he ultimate decisionmaker's exercise of judgment [does not] automatically render[] the link to the supervisor's bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Staub*, 131 S.Ct. at 1192.

Indeed, despite Defendant's apparent argument, the investigative panel's review might not have functioned as a superseding cause of the harm here. "A cause can be thought

'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Id.* (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)). Certainly, "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Id.* at 1193. "But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* Here, the panel did not develop an *alternative* reason for terminating Plaintiffs or uncover new evidence providing an *additional* reason to terminate Plaintiffs. Plaintiffs were therefore not terminated for "reasons unrelated to the supervisor's [allegedly] original biased action." *Id.* Rather, as discussed, when the panel discounted Plaintiffs' explanation for how the PM sheets were erroneously completed, a jury could find that given Mitchell's role in the investigation, the panel implicitly credited the only alternative explanation – Mitchell's accusation that Plaintiffs had falsified the forms. Far from being superseded by the panel's investigation, Mitchell's accusation and explanation for the events at issue arguably formed the basis for the panel's decision.

The case chiefly relied upon by Defendant, *Hampton v. Vilsack*, 791 F.Supp.2d 163 (D.D.C. 2011), *aff'd* 685 F.3d 1096 (D.C. Cir. 2012), is easily distinguished. In that case, the court rejected the plaintiff's "cat's paw" allegations that the discriminatory actions of his direct supervisor proximately caused his termination. *Id.* at 167-68. There, like here, plaintiff's first-line supervisor initiated an investigation into his conduct based on the reporting of another employee. *Id.* at 167. However, in *Hampton*, this ultimate investigation by plaintiff's employer, although initiated by plaintiff's supervisor, uncovered *additional* wrongdoing by plaintiff beyond the impropriety originally alleged by his supervisor. *Id.* at 168 ("The CRS investigation

concluded that the document Ms. Lipscomb had first shown to Mitchell was just the tip of the iceberg, and that numerous hotel bills submitted by plaintiff had been altered to increase the reimbursement amount supposedly owed."). Accordingly, in that case, there was arguably a "superseding cause of the harm" as the investigative panel "determine[d] that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 131 S.Ct. at 1192-93. Indeed, the D.C. Circuit affirmed the decision on this basis, noting that "[w]hen the causal relationship between a subordinate's illicit motive and the employer's ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Hampton v. Vilsack*, 685 F.3d 1096, 1102 (D.C. Cir. 2012) (quoting *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997)). In reaching this conclusion, the D.C. Circuit relied on *Staub*'s conclusion that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable." *Id.* (quoting *Staub*, 131 S.Ct. at 1193). Here, however, no such additional reason for termination emerged during the investigative panel to break the causal chain. Plaintiffs are not accused of falsifying the PM sheets filed after March 9, 2011. Rather, the existence of these forms, and the apparent inconsistency between these forms and Plaintiffs' defense against falsifying the March 9, 2011 PM sheets, arguably led the panel to credit and rely on Mitchell's explanation, preserving the causal link between his accusation and the termination. By contrast, if the panel's investigation had uncovered additional falsification by Plaintiffs beyond that alleged by Mitchell, this case would more closely resemble *Hampton*.[7]

---

[7] Furthermore, *Hampton* is distinguishable for other reasons. In contrast to the supervisor in *Hampton*, Mitchell played an active role in the investigation into Plaintiffs. *See Hampton*, 685 F.3d 1096, 1101 (D.C. Cir. 2012) ("Miller was in no way involved in the investigation of Hampton's alleged misconduct. . . . After turning over the documents to Maxwell, he took no part in the investigation or preparation of the Report."). Here, by contrast, Mitchell was the first

Accordingly, because there is a genuine issue of material fact as to whether Mitchell accused Plaintiffs of falsifying data with discriminatory animus and because, construing the facts in the light most favorable to Plaintiffs, Defendant has failed to show that Mitchell's actions were not a proximate cause of Plaintiffs' termination, the Court will deny summary judgment as to Plaintiffs' claims of discrimination in their termination.

## C. Retaliation

Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). "Like claims of discrimination, claims of retaliation are governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)). Under this framework, "a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). "If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, [non-retaliatory] reason for its actions." *Id.* (internal quotation marks omitted). If the employer proffers a non-retaliatory explanation for the conduct at issue, the burden-shifting framework "disappears," and the Court "looks to whether a

---

person to level the accusation of falsification of data and was the only person other than Plaintiffs interviewed by Nici as part of the panel investigation. Pls.' Ex. 1 at 67:1-13; *id.* at 88:13-18. In addition, in *Hampton*, the court found no evidence that "defendant's actions were motivated by discriminatory animus at all." *Hampton*, 791 F.Supp.2d at 167. In this case, as discussed, there is evidence in the record from which a jury could conclude that Mitchell was motivated by discriminatory animus in initiating and pursuing the investigation charging Plaintiffs with falsifying safety data.

reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (internal citation omitted).

Here, Plaintiffs allege that they were terminated in retaliation for engaging in the following protected activity: (1) Plaintiff Crisco's April 8, 2011 complaint to the ELES Department and WMATA's EEO Office, (2) Plaintiff Crisco's April 12, 2011 complaint with WMATA's Office of Civil Rights, (3) Plaintiff Crisco's April 15, 2011 complaint to his union regarding "unfair and bias[ed] job performance evaluations", (4) all three Plaintiffs' April 20, 2011 complaint of discrimination with WMATA's EEO Office, filed with other mechanics under Mitchell's supervision; and (5) Plaintiff Crisco's April 20, 2011 complaint to his union regarding Mitchell's racially discriminatory treatment of minority mechanics. *See* Pls.' Opp'n at 4 (citing Pls.' Ex. 10 (Crisco April 8, 2011 complaint); Pls.' Ex. 9 (Crisco's April 8, 2011 complaint), Pls.' Ex. 6 (Plaintiffs' April 20, 2011 complaint), and Pls.' Ex. 7 (Crisco's April 20, 2011 complaint) as protected activity); *id.* at 10 (citing Pls.' Ex. 6, Pls.' Ex. 9, and Pls.' Ex. 10 as protected activity; *id.* at 20 (citing Pls.' Ex. 10 and Pls' Ex. 11 (Crisco's April 15, 2011 complaint) as protected activity). *See also id.* at 29 (stating that Plaintiffs made their "first complaint on April 8, 2011").

Not all of these filings constitute protected activity. Specifically, Plaintiff Crisco's April 8, 2011 complaint does not qualify as protected activity under controlling precedent. The D.C. Circuit has made clear that "[n]ot every complaint garners its author protection under Title VII." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). *See also Pope v. ESA Servs., Inc.*, 506 F.3d 1001, 1010 (8th Cir. 2005) (stating that commenting about absence of black employees, without alleging discrimination, was insufficient to qualify as protected activity);

*Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727-28 (7th Cir. 2003) (stating that complaining about being "picked on," without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination). "While no 'magic words' are required, the complaint must in some way allege *unlawful discrimination*, not just frustrated ambition." *Broderick*, 437 F.3d at 1232 (emphasis added). *See also Francis v. Perez*, 970 F.Supp.2d 48, 68 n. 10 (D.D.C. 2013) ("Here plaintiff's two alleged 'protected activities' . . . fall short of the *Broderick* standard because there is no evidence that in either complaint plaintiff alleged discrimination on the basis of religion."). Plaintiff Crisco's April 8, 2011 complaint does not mention unlawful discrimination in violation of Title VII. Pls.' Ex. 10. Rather, in response to the falsification investigation, Crisco accuses Mitchell of "being deceitful and lying for no reason" and launching a "direct attack on [Plaintiffs'] character." *Id.* At no point in this complaint, however, does Plaintiff Crisco allege any sort of discrimination on a basis prohibited by Title VI. *Id.* Accordingly, this filing does not constitute protected activity for purposes of Plaintiffs' retaliation claim. *Peters v. Dist. of Columbia*, 873 F.Supp.2d 158, 204-05 (D.D.C. 2012) (complaints about supervisor conduct and "poor evaluations" did not constitute protected activity absent an allegation of unlawful discrimination).[8]

_____

[8] Although Plaintiffs make no argument regarding this point, the Court notes that Crisco's April 8, 2011 complaint, attached as Exhibit 10 to Plaintiffs' Opposition, lists a series of attachments. While Plaintiff has failed to include these attachments along with Exhibit 10, several of these attachments are included at other points in the voluminous record. *See* Pls.' Ex. 1 at 37 (Crisco April 6, 2011 Statement); Pls.' Ex. 15 (Cell Phone Records); Pls.' Ex. 26 (Crisostomo Witness Statement). Nevertheless, like the complaint itself, none of these filings mention discrimination on a basis prohibited by Title VII. The closest Plaintiff Crisco comes to alleging such discrimination is in his April 6, 2011 Statement, listed as an attachment to his April 8, 2011 complaint. In this statement, Crisco again describes Mitchell as a liar who has fabricated the grounds for investigating Plaintiffs. *See* Pls.' Ex. 1 at 37 ("It is unbecoming of a Supervisor who would try to destroy the character of both myself and other co-workers by lying to our

Defendant does not contest that Plaintiffs' remaining complaints constitute protected activity. Instead, Defendant seeks to dismiss the remainder of Plaintiffs' retaliation claim for failure to establish a causal link between Plaintiffs' protected activity and their termination. Def.'s MSJ at 16-20. Def.'s Reply at 15-17. Defendant argues that Plaintiffs' retaliation claims must be dismissed because Bitar, the relevant decision-maker as to the issue of their termination, had no knowledge of their complaints. Def.'s MSJ at 17-18. This lack of knowledge, Defendant contends, severs the causal link between the protected activity and the adverse employment action. However, "to survive summary judgment . . . [Plaintiffs] needn't provide direct evidence that [their] supervisors knew of [their] protected activity; [they] need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones*, 557 F.3d at 679. As the D.C. Circuit has held, "that 'the *employer* had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity' – is adequate to permit an inference of retaliatory motive,' at least at the prima facie stage." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)) (emphasis in original). Here, while Defendant disputes that Bitar himself had knowledge of Plaintiffs' complaints, Defendant *does not* argue that WMATA itself had no knowledge of these filings. The temporal proximity

---

higher Managers about an incident that he caused to gain favor in their eyes, to protect and hide his true low integrity as a man."). In the process of attacking Mitchell as "a coward", Crisco states "I along with other co-workers are finding it hard to work for a Supervisor who is dishonest with a bias and uncaring attitude." Plaintiffs make no mention of this document itself or this specific statement in their briefing. Nevertheless, the Court notes that this single statement is not enough to render Plaintiff Crisco's April 8, 2011 filing protected activity. Mere use of the word "bias" in the absence of an explanation of whether this bias constitutes discrimination in violation of Title VII is akin to the bare use of the word "discrimination" which without any discussion of a protected basis is insufficient to create protected activity. *See, e.g., Hunter v. Dist. of Columbia,* 905 F.Supp.2d 364, 379 (D.D.C. 2012), *aff'd Hunter v. Dist. of Columbia Gov't,* No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013); *Hajjar-Nejad v. George Washington Univ.*, No. 10-cv-626, 2014 WL 1280228, at *39 (D.D.C. Mar. 31, 2014).

between Plaintiffs' protected activity and their termination is sufficient to satisfy the causal component of Plaintiffs' prima facie case.

Yet "[a]lthough close proximity in time may establish a causal connection to make out a prima facie case of retaliation, more is required to establish pretext." *Nurriddin v. Bolden*, No. 04-cv-2052, 2014 WL 1648517, at *23 n. 17 (D.D.C. Apr. 25, 2014). *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine."); *Butler v. Dist. of Columbia Housing Fin. Agency*, 593 F.Supp.2d 61, 66 n. 13 (D.D.C. 2009) (plaintiff "cannot rely on temporal proximity alone to establish *pretext*; he must point to additional evidence.") (emphasis in original). Here, WMATA has asserted a legitimate, non-retaliatory explanation for Bitar's decision to terminate Plaintiffs' employment, specifically that an investigative panel concluded that they had falsified data entries on PM sheets. Def.'s MSJ at 16. Plaintiffs offer absolutely no reason why this explanation is pretext for a *retaliatory* motive. Indeed, Plaintiffs' briefing in support of their retaliation claim focuses entirely on Mitchell, the subject of Plaintiffs' protected activity. Pls.' Opp'n at 29-31. Yet this argument, focused entirely on Mitchell's potentially retaliatory motive, ignores the timing of Plaintiffs' protected activity. Plaintiff Crisco first engaged in protected activity on April 12, 2011. By this point, Mitchell no longer played an active role in the investigation and termination of Plaintiffs. While his earlier actions in support of the investigation may have been motivated by discriminatory animus, as discussed *supra* Section III.B.2, Mitchell had no involvement in the investigation and termination decision at any point *after* April 12, 2011. Indeed, two days *earlier* on April 10, 2011, Nici had submitted the investigative panel's report to Watson, apparently concluding Nici's role in the termination decision. *See* Def.'s Ex. 15. Plaintiffs may ultimately persuade a jury that the decision to

terminate them was infected with Mitchell's discriminatory animus, but it defies logic to argue that *Mitchell* retaliated against them for protected activity occurring well after his role in the investigation had completed. By the time Plaintiffs engaged in protected activity, the decision as to their termination was in Bitar's hands. Mitchell no longer had the opportunity to retaliate against them. And Plaintiffs provide no evidence that Bitar himself was motivated by a retaliatory motive. Plaintiffs do not cast doubt on Defendant's proffered explanation that Bitar relied on the investigation – which again, concluded prior to Plaintiffs' protected activity.

Indeed, perhaps the only argument Plaintiffs offer to show Bitar's explanation is pretextual is a WMATA memoranda stating that dismissal is appropriate upon an employee's fifth offense for failing to complete paperwork. Pls.' Opp'n at 30 (citing Pls.' Ex. 24 (WMATA Memoranda Regarding Disciplinary Actions for Failure to Complete ALL Paperwork)). Plaintiffs devote much of their briefing to arguing that Mitchell improperly singled them out for investigation, while allowing other non-minority mechanics the opportunity to correct errors in their paperwork. *Id.* Again, this alleged disparate treatment by Mitchell may be relevant to the issue of Mitchell's discrimination and its relationship to Plaintiffs' termination. However, due to the timing of Plaintiffs' protected activity, Mitchell's actions are irrelevant to the issue of retaliation. Yet, although their briefing is less than precise, Plaintiffs could also be arguing that Bitar failed to follow appropriate procedures in terminating Plaintiffs because he should have imposed a less severe sanction. As the D.C. Circuit has noted, in the Title VII context a plaintiff can cast doubt on a defendant's asserted reason by pointing to the defendant's "failure to follow established procedures or criteria." *Brady*, 520 F.3d at 495 n. 3. Here, Bitar's failure to impose a lesser sanction, Plaintiffs may be arguing, conflicts with the disciplinary memorandum setting out dismissal as appropriate only for a fifth offense. Yet, even read generously, Plaintiffs'

argument still fails. As Defendant points out, this memorandum addresses a distinct issue – the discipline associated with a mechanic's failure to *complete* all paperwork. Def.'s Reply at 16. Here, Bitar was determining the discipline for a different alleged violation, as the investigative panel had concluded that Plaintiffs had *falsified* safety data. Bitar states in his affidavit that "any time that an employee is any of my departments is under investigation for the falsification of records, discipline up to termination is contemplated."[9] Def.'s Ex. 9 ¶ 12. Plaintiffs have therefore failed to show that Bitar did not follow appropriate procedures in choosing to terminate them, and thus they provide no reason to believe that his stated explanation for termination is pretext masking a retaliatory motive. Accordingly, Plaintiffs' retaliation claims are dismissed.

## IV. CONCLUSION

For all of the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART Defendant's [22] Motion for Summary Judgment. Specifically, the Court GRANTS Defendant's motion with respect to Plaintiffs' claims of discrimination premised on negative performance evaluations, as well as Plaintiffs' retaliation claims. However, the Court DENIES Defendant's motion with respect to Plaintiffs' discrimination claims premised on the termination of their employment. An appropriate Order accompanies this Memorandum Opinion.

Date: July 9, 2014

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

---

[9] Whether Plaintiffs were appropriately accused of falsification of data by Mitchell, as opposed to some lesser offense, is a separate question, addressed *supra* Section III.B.2. However, Plaintiffs provide no reason to believe that Bitar, faced with an investigative panel's conclusions that Plaintiffs had falsified data, failed to follow proper procedure in choosing termination as a sanction.